**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MADELEINE ENTINE,** | : | |
| | : | **Case No. 2:17-cv-946** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **SCOTT LISSNER,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**OPINION & ORDER**</u>

Plaintiff Madeleine Entine is a second-year undergraduate student at the Ohio State University ("Ohio State," or the "University"). Entine has been diagnosed with depression, anxiety, obsessive-compulsive disorder, and post-traumatic stress disorder. She suffers from debilitating panic attacks. And she has trained her beloved eight-year-old Cavalier King Charles Spaniel, Cory, to disrupt her panic attacks by jumping on her chest and licking her face. Those tactile sensations restore Entine's ability to breathe and move during times of medical crisis.

Entine and Cory live in the Chi Omega sorority house on Ohio State's campus. But the sororal bonds at Chi Omega have weakened in recent months—Entine's Chi Omega sister, Carly Goldman, claims to be severely allergic to Cory. Those allergies, Goldman claims, exacerbate her Crohn's disease, causing her significant pain and distress.

For Entine, this case is about whether, under the Americans with Disabilities Act ("ADA"), she can continue to live in the Chi Omega house with Cory. For the Defendant, Scott Lissner, Ohio State's ADA Coordinator, this case is about a thorny and largely unmapped legal issue: how the University should reconcile the needs of two disabled students whose reasonable

1

accommodations are (allegedly) fundamentally at odds.  But for the Court, this case merely entails a straightforward application of ADA regulations.

Under clearly established law, Entine and Cory prevail.  Based on the evidence of record, it is unclear whether Goldman ever requested an accommodation under the ADA for her allergy to a service animal.  It *is* certain, however, that Lissner did not perform the inquiry required under the ADA before disallowing the use of a service animal.  In fact, Lissner did not even establish that it was Cory who aggravated the symptoms of Goldman's disability.

For all of these reasons, detailed further below, Entine's Motion for a Preliminary Injunction (ECF No. 10) is **GRANTED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Entine is a second-year undergraduate student at Ohio State and the slated[1] Vice President of the Zeta Alpha chapter of the Chi Omega sorority.  (Verified Compl., ECF No. 1, ¶ 2; Nov. 8, 2017 Prelim. Inj. Hr'g Tr. ("Hr'g Tr. Vol. I").)  Lissner is the University's ADA Coordinator. (ECF No. 1 ¶ 3.)  Ohio State is a department, agency, or other instrumentality of the state of Ohio and therefore is a public entity under Title II of the ADA.  (*Id.* ¶ 37.)  Ohio State receives federal financial assistance for purposes of Section 504 of the Rehabilitation Act.  (*See id.* ¶¶ 48–49.)

Generally, first- and second-year undergraduate students are required by University policy to live in campus housing, but the University makes an exception for second-year students "to live in a social fraternity or sorority house maintained exclusively for its members if

---

[1] As the slated Vice President of Chi Omega, Entine was selected for the position by members of Chi Omega's executive board, has been approved by a two-thirds vote of the sorority, and currently has certain executive duties.  (Hr'g Tr. Vol. I.)  She will become Chi Omega's active chapter Vice President during the Spring 2018 semester.  (*Id.*)

the house meets the University's Greek Housing Standard and Greek Housing Implementation Report and if the University approves the house to host second-year students." (Pl.'s Mot. for TRO, ECF No. 2, at 3.) Entine applied for and was approved to live in the Chi Omega house. (ECF No. 1 ¶ 9.) Not only is living in the sorority house important to Entine socially—as it "facilitates close social relationships between sorority sisters and provides additional and different living spaces and dining experiences not available in campus housing" (ECF No. 2 at 3)—but also, as the incoming Vice President of Chi Omega, she is required by the sorority's bylaws to live in the sorority house. (*Id.*; *see also* Prelim. Inj. Hr'g, Pl.'s Ex. 2.)

Entine has a disability under the ADA. (ECF No. 1 ¶ 11.) She suffers from severe panic attacks that render her immobile, restrict her breathing, and cause her to hyperventilate. (*Id.* ¶ 13.) She has been hospitalized for these panic attacks and has received medical and psychiatric treatment for them. (*Id.* ¶ 11.) In fact, before starting school for the semester in August 2017, Entine was suicidal, and committed herself to Harding Hospital at the Ohio State University Wexner Medical Center. (Hr'g Tr. Vol. I.) After this visit, medical staff at Harding confirmed that Entine meets the diagnostic criteria for generalized anxiety disorder with panic attacks, post-traumatic stress disorder, obsessive-compulsive disorder, and unspecified depressive disorder, conditions which substantially interfere with her daily life. (ECF No. 2 at 4; Hr'g Tr. Vol. I.)

To assist in coping with her disability, Entine has a service dog—an eight-year-old Cavalier King Charles Spaniel named Cory. (ECF No. 1 ¶ 14; *see also* Hr'g Tr. Vol. I.) Entine has trained Cory to perform the specific task of climbing on her torso when she has a panic attack. (ECF No. 1 ¶ 14.) When Entine feels Cory's weight on her torso, that tactile sensation restores her ability to breathe and move. (*Id.*; *see also* Hr'g Tr. Vol. I.) Cory's smell lowers

3

Entine's heart rate during her panic attacks, and he licks the tears from her face when she is unable to reach for tissues.  (Hr'g Tr. Vol. I.)  During a panic attack, Cory makes Entine feel less alone.  (*Id.*)  Cory also provides "general passive support" to Entine, and his presence has resulted in Entine suffering panic attacks that are less frequent and shorter in duration.  (Hr'g Tr. Vol. I; ECF No. 1 ¶ 15.)  At the Preliminary Injunction hearing, Entine testified that, during times when she is particularly depressed, knowing that she has Cory—a living creature that depends on her to feed him and take him outside—is the only thing that has enabled her to get out of bed.  (Hr'g Tr. Vol. I.)

After receiving her diagnosis, Entine notified the University of her disability.  (ECF No. 1 ¶ 16.)  The University accommodated Entine's disability by permitting Cory to accompany Entine to "areas and buildings on campus where University policies would normally prohibit animals."  (ECF No. 2 at 4.)  Additionally, Entine notified the private landlord that owns the Chi Omega sorority house about Cory.  While the sorority house is privately owned, the University requires it "to follow its policies and decisions relating to disability discrimination and compliance."  (*Id.*)  Accordingly, the landlord modified the Chi Omega house's no-animal policy.  (*Id.*)  This modification allowed Entine to live in the house with Cory, and both have resided there since August 28, 2017.  (ECF No. 1 ¶ 18.)

Chi Omega also informed Lissner about Cory's presence in the sorority house.  (*See* Hr'g Tr. Vol. I.)  According to Lissner, he agreed with the decision to allow Cory to live in the Chi Omega house with Entine at the time, but also suggested to Chi Omega that they should consider setting boundaries and determining which spaces Cory was permitted to enter.  (*See id.*)  Chi Omega therefore provided Entine with a written plan for accommodating Cory.  (*See* Prelim. Inj.

4

Hr'g, Pl.'s Ex. 9.)  Under this plan, Cory was permitted only in Entine's bedroom and in the formal living room; he was not allowed on the living room furniture.  (*See id.*)

Around September 10, 2017, another Chi Omega member and resident of the sorority house, Carly Goldman, objected to Cory's presence due to her allergies.  (ECF No. 1 ¶ 19.)  At the Preliminary Injunction hearing, Goldman testified that she was not simply allergic to Cory, but that his presence in the Chi Omega sorority house was exacerbating the symptoms of her Crohn's disease.  (*See generally* Hr'g Tr. Vol. I.)  When suffering from a "flare" in her Crohn's symptoms, Goldman experiences painful bloating, and her bowel movements typically occur either nonstop, or once every three to four weeks.  (*See id.*)  These symptoms impact Goldman's ability to attend class and socialize with her friends, causing her to feel isolated.  (*Id.*)  The inability to predict when her Crohn's symptoms will "flare" also causes Goldman anxiety, for which she sees a therapist.  (*See id.*)

During her lengthy testimony about living with Crohn's disease, Goldman stated that she has had stomach issues since birth, but was officially diagnosed with Crohn's in April 2015. (*Id.*)  Goldman repeatedly testified that it is "uncertain" when her Crohn's symptoms will "flare," and that she has no knowledge of what causes these "flares."  (*See id.*)  Indeed, Goldman recalled that she had a "flare" in her Crohn's symptoms approximately every two weeks during the first four months of her freshman year, which she speculated may have been attributable to the anxiety she was feeling about beginning college.  (*Id.*)  Goldman also had a significant "flare" in her Crohn's symptoms when she traveled to London for an eight-week-long summer internship program.  (*Id.*)  Goldman returned home halfway through the program, because she had not had a bowel movement in four weeks, which impacted her ability to perform at her internship.  (*See id.*)

When Goldman began college at Ohio State, she met with the Office of Student Life – Disability Services ("Disability Services") to inform them about her Crohn's disease and request accommodations.  (*Id.*)  The University provided Goldman with a parking pass that allows her to park close to her classrooms in case she needs to use the restroom quickly or leave class to return home.  (*Id.*)  Additionally, if Goldman has to leave during an exam to go to the restroom, she gets that time back at the end of the exam, and she can leave a recording device in her classrooms if she has to excuse herself so that she does not miss any portion of a lecture.  (*Id.*)  Finally, during her freshman year, Goldman lived in a dorm with a more private restroom than the communal restrooms in most first-year housing.  (*See id.*)

In addition to Crohn's disease, Goldman suffers from allergies and asthma.  (*Id.*)  Goldman testified she is allergic to certain types of trees, pollen, mold, dust mites, cockroaches, cats, and dogs.  (*Id.*)  Depending on the severity of the allergy, Goldman experiences symptoms ranging from "itchy eyes," a "stuffy nose," and rashes on her body to anaphylactic shock that needs to be treated with an EpiPen.  (*Id.*)  Goldman testified that she has not experienced anaphylactic shock as a result of her dog allergy, but suffers from swollen eyes, throat closure, a clogged nasal passageway, and rashes when she is exposed to dogs.  (*See id.*)  Interestingly, however, Goldman herself owns a dog.  (*Id.*)  For eleven years, Goldman's family has owned a Shih Tzu named Rocky.  (*Id.*)  Goldman testified that Rocky does not exacerbate her allergies because he is "hypoallergenic."  (*Id.*)  But she also advanced a seemingly conflicting proposition that to keep her allergies at bay, her family keeps Rocky confined to the first floor of their home, and to rooms without carpet.  (*Id.*)

In mid-August 2017, when Goldman moved into the Chi Omega sorority house, she noticed that her eyes were red and itchy, and that she was congested.  (*Id.*)  Goldman also

testified that she felt her throat and nasal passages constricting when she was trying to sleep at night, and developed a rash on her hands and chest.  (*Id.*)  Goldman alleged that she developed these symptoms from Cory's mere presence in the Chi Omega house, despite the fact that she attempted to avoid him "at all costs."  (*See id.*)  For example, Goldman claimed that she once saw Cory sitting in the hall outside the sorority house's mail room, and was resultantly unable to go into the room to retrieve her mail.  (*Id.*)  On another occasion, her roommate slept in another sorority sister's bedroom.  (*Id.*)  Unbeknownst to Goldman, Cory had been in the woman's bedroom earlier, and when Goldman's roommate returned the next morning, Goldman had an allergic reaction—likely, she speculated, due to the presence of Cory's dander on her roommate's blanket.  (*See id.*)

But it is not lost on the Court that Entine was on the witness stand for the better part of a day during the Preliminary Injunction hearing, with Cory on her lap the entire time.  Surely, if Goldman's allergies are triggered by Cory's presence in the three-floor Chi Omega sorority house, one could assume that Goldman, who took the stand shortly after Entine, would have had an adverse reaction to sitting in the same chair occupied by Cory merely an hour earlier.  Not so. Goldman appeared symptom-free during her time on the witness stand and testified without any visible duress for well over an hour.

According to Goldman, the anxiety caused by her allergic reaction to Cory aggravated her Crohn's symptoms.  (*Id.*)  Goldman therefore informed the sorority's "house mom," members of the sorority's executive board, and the Chi Omega house's landlord, about her allergy to dogs.  (*See id.*)  The landlord referred Goldman's complaint to Lissner, the University's ADA Coordinator.  (ECF No. 1, ¶ 20.)

As the University employee with the authority to address Goldman's complaint, Lissner began his investigation. First, he asked Entine and Goldman to submit information about their respective medical conditions to his office, which both did. (*See id.* ¶ 21.) Lissner also met with both Entine and Goldman in person to discuss the situation. (Hr'g Tr. Vol. I.) In his meeting with Entine, Lissner discussed abiding by the boundaries for Cory set forth by Chi Omega. (Nov. 9, 2017 Prelim. Inj. Hr'g Tr. ("Hr'g Tr. Vol. II").) Entine conveyed that her fellow Chi Omega sisters told her that Goldman had questioned the validity of Entine's medical conditions and disputed the necessity of having Cory. (Hr'g Tr. Vol. I.) Even so, Entine told Lissner that she was willing to compromise—including limiting Cory to certain areas of the sorority house and eating in isolation outside of the dining area. (*Id.*) But despite these concessions, Goldman told Entine that "one of [them] had to leave [the sorority house] and it [wasn't] going to be her." (*Id.*)

By contrast, Lissner got the impression during his meeting with Goldman that she was willing to remain in the sorority house with Cory "so long as there was minimal-to-no exposure." (*Id.*) Goldman's optimism that the sisters could cohabitate in the Chi Omega house waned, however, when she observed Entine disregarding the written guidelines for Cory's presence in the sorority house. (*See* Hr'g Tr. Vol. II.)

Lissner testified that, when he met with Goldman, she objected to Chi Omega's modification of its no-animal policy and Cory's presence in the sorority house, and sought to minimize her exposure to Cory. (*See* Hr'g Tr. Vol. I.) According to Lissner, because Goldman presented to him "a constellation of conditions that typically qualify as disabilities and said they generated a need for separation from the dog," he took her words as "a plain language

accommodation request." (*Id.*)  In his meeting with Goldman, Lissner did not ask if she owned a dog or had exposure to other dogs.  (*See id.*)

At Ohio State, students with disabilities initially report their disability to Disability Services.  (*See id.*)  When a student seeks an accommodation, the first step is for the student to complete paperwork and participate in an interactive interview with a representative from Disability Services.  (*See id.*)  Disability Services keeps on file all "baseline medical documentation" the students provide as well as information about students' accommodations.  (*Id.*)  This information is used to help generate letters to faculty members to inform them about students' accommodations.  (*See id.*)  Student appeals of the denial of accommodations are handled by Lissner's office.  (*See id.*)

Lissner acknowledged that Goldman's "request" was not documented, unlike the accommodations she had previously sought for her Crohn's symptoms, which were on file with Disability Services.  (*See id.*)  Rather, Goldman's complaint was presented directly to Lissner— and it was presented, in his opinion, as "a conflict to be resolved [between] two disability needs." (*Id.*)  Because Goldman's objection was lodged directly to Lissner "at the dispute resolution level," it was not memorialized as an accommodation request in Disability Services' recordkeeping system.  (*See id.*)  Lissner did not direct Goldman to Disability Services after he spoke with her, and he acknowledges that Goldman never "explicitly requested a disability accommodation from the modification that was made at the Chi Omega house to allow Ms. Entine and Cory to live there." (*Id.*)  Lissner testified that he takes minimal case notes, and that in this case, he believes his e-mail correspondence with Entine and Goldman is sufficient to show that Goldman requested an accommodation.  (*See id.*)

In addition to his in-person meetings with Goldman and Entine, Lissner reviewed both women's medical records. (*See id.*) Nowhere in the three letters provided by Goldman's physicians (Prelim. Inj. Hr'g, Pl.'s Exs. 7, 10; Def.'s Ex. 5) does it state that Goldman cannot reside in the Chi Omega house with Cory or that removing Cory from the Chi Omega house is the only way to alleviate Goldman's symptoms. (*See id.*; *see also* Hr'g Tr. Vol. I.) When reviewing the lab results of Goldman's most recent allergy test (Prelim. Inj. Hr'g, Pl.'s Ex. 12), Lissner saw that there were abnormal levels of eleven different allergens in Goldman's system— including cat and dog dander, cockroaches, and dust mites. (*Id.*) The level of dust mite allergens in Goldman's system was 11.60 kU/L for one species, and 20.20 kU/L for another, while the level of dog dander was 8.91 kU/L. (*Id.*) Lissner considered these other allergens, but ultimately did not consider the possibility that these "environmental constants" were the cause of Goldman's exacerbated allergy symptoms because those variables were "minimally controllable." (Hr'g Tr. Vol. I.) Lissner did not contact Goldman's allergist to confirm whether a particular allergen was the source of Goldman's symptoms. (*Id.*)

In the final stage of his investigation, Lissner visited the Chi Omega sorority house to get a "better understanding of the room usage, air flow, HVAC systems," etc. in the house. (*Id.*) He also explored the possibility of one of the students moving to a different bedroom, but determined that Goldman's room was the optimal room in the house in terms of airflow, even though it was not geographically as far as possible from Entine's room.[2] (*See id.*)

---

[2] Goldman's and Entine's bedrooms are in separate wings of the second floor of the Chi Omega sorority house. (*See* Hr'g Tr. Vol. I.) At the time Lissner toured the Chi Omega house, there were several free bedrooms on the third floor of the house. (*See id.*)

On October 4, 2017, Lissner issued a written determination in response to Goldman's complaint.  According to Lissner, Entine and Goldman both "have needs that rise to the level of disability under university policy and the Fair Housing Act," and the "accommodation needs of the two individuals are at odds."  (Compl. Ex. A, ECF No. 1-1.)  Because Lissner could not identify a "pattern of limits on occupancy that both can agree would allow mutual habitation in the house," Lissner determined that "the resolution for this impasse is based on who secured their lease first."[3]  (*Id.*)  Lissner decided that whoever secured their lease second would have the choice to move out of the Chi Omega house, or stay in the house without their accommodation. Because Entine secured her lease after Goldman, she had to choose either to stay in the Chi Omega house without Cory, or to move out.  (*See id.*)  In his written determination and in correspondence with Entine, Lissner referred to Cory as an emotional support animal ("ESA"), rather than acknowledging Cory's status as a service animal.  (*See, e.g.*, *id.*)

The University notified Entine on October 24, 2017, that its decision that she could not reside in the Chi Omega sorority house with Cory was final.  (ECF No. 1 ¶ 32.)  Lissner directed Entine either to give up Cory or vacate the house by October 30, 2017.  (*Id.* ¶ 33.)

Entine filed her Verified Complaint (ECF No. 1) and Motion for Temporary Restraining Order (ECF No. 2) against Lissner on October 26, 2017, bringing claims for violations of the ADA and the corresponding Ohio statute, the Fair Housing Act ("FHA"), and Section 504 of the Rehabilitation Act.  The following day, the Court granted Entine's Motion for a TRO at the S.D. Ohio Civil Rule 65.1 conference.  (*See* ECF No. 8.)  The Court held a hearing on Entine's

---

[3] This "disability-neutral" means of determining who was required to vacate the Chi Omega sorority house is not enshrined in any of the University's written policies or procedures, and has been used only once in the past by Lissner to resolve a similar situation.  (*See* Hr'g Tr. Vol. II.)

Motion for Preliminary Injunction (ECF No. 10) on November 8–9, 2017, and the Motion is now ripe for adjudication.

## II.    LAW AND ANALYSIS

### A. Standard of Review

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  In light of its "limited purpose," a preliminary injunction is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  Accordingly, a party need not prove her case in full at a preliminary injunction hearing. *Id.*

When considering a motion for preliminary injunction, a district court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.  *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012).  These four considerations are "factors to be balanced, not prerequisites that must be met."  *Certified Restoration*, 511 F.3d at 542.  Whether the combination of the factors weighs in favor of issuing injunctive relief in a particular case is left to the discretion of the district court.  *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

### B. Entine Is Likely To Succeed on the Merits of Her Claims.

The ADA regulations require Ohio State to make reasonable modifications to its policies in order to avoid discrimination on the basis of disability.  *See* 28 C.F.R. § 35.130(b)(7).  Among

other things, the University must generally permit the use of a service animal, *id.* § 35.136(a), subject to several narrow exceptions: (1) if the animal's presence would fundamentally alter the nature of the University's services, programs, or activities; (2) if the animal would pose a direct threat to the health or safety of others; or (3) if the animal was out of control or not housebroken. *See id.* §§ 35.130(b)(7)(i); 35.139; 35.136(b).  When analyzing the "direct threat" exception, an entity must perform the following inquiry:

> In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

*Id.* § 35.139(b).  Further, the U.S. Department of Justice's guidance for interpreting the ADA regulations states that allergies and fear of dogs are not valid reasons for denying access to people using service animals.  (*See* ECF No. 10, Ex. A ("DOJ Guidance"), at 2.)

Under the ADA, a service animal is defined as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability."  28 C.F.R. § 35.104. Because Cory is specifically trained to climb on Entine's torso during a panic attack, he meets the definition of a service animal under the ADA.[4]

In granting Entine's Motion for a TRO, this Court found that Lissner did not perform the proper inquiry under the ADA before presenting Entine with the decision either to vacate the Chi Omega house or live there without Cory.  On a fuller evidentiary record, this finding remains sound.

---

[4] The Department of Justice's Guidance on the ADA explicitly identifies "calming a person with Post Traumatic Stress Disorder (PTSD) during an anxiety attack" as a type of task that service animals are trained to perform.  (*See* DOJ Guidance at 1.)

As a threshold issue, however, the Court questions whether Goldman ever sought a reasonable accommodation that would trigger such an inquiry.  It is Lissner's position that Goldman's presentation of the "constellation" of her symptoms and her desire to minimize contact with Cory constituted a request for a reasonable accommodation under the ADA (*see* Hr'g Tr. Vol. I), requiring him to resolve a conflict between two disabled students who require incompatible accommodations.  Entine believes that Lissner's framing "misconstrues the issue." (ECF No. 10 at 3.)  According to Entine, "this case implicates only one accommodation or modification of policy: [her] request to have her service dog in the house."  (*Id.*)  Goldman did not request an accommodation; rather, she objected to the modification of the Chi Omega's no-animal policy.  (*See id.*)

The Court agrees with Entine.  The ADA by no means requires a disabled individual to use the words "reasonable accommodation" in making such a request.  *See Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2007).  But nor does the ADA require that an individual with a disability receive all possible accommodations for his or her disability—the accommodations must be "reasonable" and specifically tied to an existing medical condition.  *See id.*  Indeed, this is why individuals with disabilities must often go through the interactive process multiple times: to request new accommodations for evolving symptomology.

Upon enrolling in Ohio State, Goldman informed the University about her Crohn's disease and specifically requested and received parking, first-year housing, and academic accommodations.  (Hr'g Tr. Vol. I.)  Disability Services has a record of these accommodations. (*See id.*)  But with regard to Cory, rather than request an accommodation to alleviate his purported exacerbation of her Crohn's symptoms, Goldman objected to his presence in the Chi Omega house.  In other words, once Chi Omega modified its no-animal policy to accommodate

Entine, a new status quo was created—a status quo which Goldman must have sought an accommodation to alter.  Furthermore, Lissner testified that this purported accommodation request came to his attention at the "dispute resolution" stage, that he did not direct Goldman to reiterate this request to Disability Services and document it, and that he never informed Disability Services of this accommodation request.  (*See* Hr'g Tr. Vol. I.)

Regardless of how Goldman's objection to Cory's presence in the Chi Omega house is characterized, i.e., even assuming, *arguendo*, that Goldman requested an accommodation, Entine still is likely to succeed on the merits of her ADA claim in light of Lissner's failure to perform properly a "direct threat" analysis under the statute.[5]  In determining whether Cory is a "direct threat" to Goldman's health, Lissner was required to make:

> an *individualized assessment*, based on reasonable judgment that relies on current *medical knowledge or on the best available objective evidence*, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

*Id.* § 35.139(b) (emphasis added).  In contrast to Lissner's assertion that he is not permitted to compare Entine's and Goldman's disabilities and instead must look to a "disability-neutral" metric for determining which student to accommodate, the plain language of the ADA regulations dictates otherwise.  Lissner was required to conduct an assessment of Goldman's disability and make a reasonable judgment, based on all of the evidence, whether Cory's presence in the Chi Omega house was such a threat to Goldman's health that, in essence, her disability overrode the ADA's default position to allow service animals.

---

[5] Lissner acknowledged that Cory is neither not housebroken nor out of control (*see* Hr'g Tr. Vol. I), and thus whether Cory would pose a "direct threat" to the health or safety of others is the only potentially applicable exception to the ADA's general allowance of service animals as a reasonable accommodation.

Lissner himself admits that he did not perform a direct threat analysis.  (Hr'g Tr. Vol. I.) Rather, he performed what he coined a "modified direct threat analysis."  (*Id.*)  That is, he determined that Goldman did not have anaphylactic shock as a result of her dog allergy, and therefore deemed it unnecessary to remove immediately her or Cory from the Chi Omega house. (*See id.*)  And while Lissner reviewed medical evidence, it is hard to say that he came to a reasonable judgment, as none of the evidence shows that it was Cory that caused Goldman's increased Crohn's symptoms.

Goldman's own testimony was that she has no way of knowing what causes the "flares" in her Crohn's symptoms.  (*See id.*)  She has suffered "flares" while at home in Long Island, New York; during her freshman year of college at Ohio State; and while studying abroad in London.  (*Id.*)  And Goldman has not even testified that Cory *himself* causes her Crohn's symptoms to "flare."  Rather, she claims that the *anxiety* she experiences as a result of her allergic reaction causes the increased symptoms.  (*See id.*)  Indeed, it appears that anxiety is a common denominator in the flare-ups of Goldman's Crohn's symptoms—as evidenced by her experiencing "flares" during the undoubtedly stressful times of starting college and living in a foreign country.  Perhaps Goldman was anxious about starting a new school year and living in a sorority house with her new sorority sisters and this anxiety, rather than Cory, worsened her Crohn's symptoms.  Even if Goldman were able to tie her anxiety to Cory, however, the underlying analysis remains unchanged, because: (1) Goldman did not request an accommodation for anxiety; and (2) anxiety resulting from the presence of a dog is not a justification for denying an individual access to a service animal.[6]  (*See* DOJ Guidance at 2.)

---

[6] "Allergies and fear of dogs are not valid reasons for denying access or refusing service to people using service animals."  (DOJ Guidance at 2.)

Also, the lab results from Goldman's allergy testing show abnormal levels of multiple allergens in her system—including cockroaches and dust mites—two allergens very likely to be present in a sorority house or *any* campus housing. (Prelim. Inj. Hr'g, Pl.'s Ex. 12.) Lissner did not rule out these other allergens as aggravator of Goldman's Crohn's, nor did he confirm with her allergist that the dog dander was the causal factor. (Hr'g Tr. Vol. I.) None of the medical documentation submitted by Goldman states that Cory is the cause of Goldman's aggravated Crohn's symptoms. (Prelim. Inj. Hr'g, Pl.'s Exs. 7, 10; Def.'s Ex. 5.) In short, there is a gaping hole in Lissner's case: the nexus between Goldman's worsening symptoms and Cory's presence in the Chi Omega house. Without establishing causation, it is impossible to say that Lissner performed the rigorous "direct threat" analysis required by the ADA.

Furthermore, Lissner did not thoroughly explore other alternatives to removing Cory from the Chi Omega house—particularly in light of the fact that *none* of the medical documentation suggested that Goldman could not, under any circumstances, reside in the same house as Cory.

Because Lissner did not conduct the proper "direct threat" analysis required by the ADA, Entine is likely to succeed on the merits of her ADA claim. While the Court certainly takes issue with Lissner's use of an arbitrary, "disability-neutral" standard that is conspicuously absent from the University's written policies and procedures, it need not even address the complicated issue of how correctly to address competing, incompatible accommodations. Because Lissner did not determine that Cory was the cause of Goldman's symptoms, he did not properly conduct the "direct threat" analysis. Cory is therefore not subject to any of the narrow exceptions to the

ADA's general rule permitting service animals.  Accordingly, the first factor weighs heavily in favor of granting an injunction.[7]

### C. Entine Will Suffer Irreparable Harm in the Absence of an Injunction.

The second factor the Court must consider also favors Entine.  Where, as here, a plaintiff seeks injunctive relief to prevent the violation of a federal statute that specifically provides for injunctive relief (as the statutes at issue do), she need not show irreparable harm.  *Jordan v. Greater Dayton Premier Mgmt.*, 9 F. Supp. 3d 847, 862 (S.D. Ohio 2014) (citation omitted).  But even so, Entine has shown she will suffer irreparable harm because, in the absence of injunctive relief, she will either be forced to move out of the Chi Omega house or live in the house without Cory.  And if she does choose to move out of the house and her room is re-rented to another sorority member, she will not be able to return to the house if the Court ultimately rules in her favor.  *See Chapp v. Bowman*, 750 F. Supp. 274, 277 (W.D. Mich. 1990) (finding that plaintiffs demonstrated they would suffer irreparable injury if they sold property to an innocent purchaser in the absence of a preliminary injunction, because they could not undo the sale).  Moreover, as Vice President of the Chi Omega sorority, Entine is required to live in the sorority house.  Thus, if Entine moves out of the house, she could lose her position as an officer in the Chi Omega sorority.

Lissner asserts that Entine's arguments regarding irreparable harm are meritless because: (1) she has sued only Lissner individually, who "has no authority over housing assignments in

---

[7] The parties' focus in their briefing and at the Preliminary Injunction hearing was largely on the likelihood of Entine's success on the merits of her ADA claim, as the ADA has the highest standard: only service animals are deemed a reasonable accommodation under the ADA.  Under both the Fair Housing Act and Section 504 of the Rehabilitation Act, however, ESAs qualify as reasonable accommodations. *See Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 859–61 (S.D. Ohio 2009); *Velzen v. Grand Valley State Univ.*, 902 F. Supp. 2d 1038, 1047 (W.D. Mich. 2012).  Thus, if Entine is likely to prevail on her ADA claim, there is a substantial likelihood that she will succeed on her claims under these less demanding statutes.

the Chi Omega house, which are exclusively within the purview of Chi Omega and ZACO [(the landlord for the Chi Omega house)]; and (2) Lissner has been unable to confirm that Entine is the Vice President of Chi Omega, and there is no evidence in the record that, even if Entine is the Vice President, she has sought a reasonable accommodation through the organization's policies that would allow her to serve as an officer in the sorority while not living in the Chi Omega house.  (ECF No. 14 at 12.)

But at the Preliminary Injunction hearing, Entine established that she is currently the Vice President-elect of Chi Omega, and that her term as active Vice President will begin in Spring 2018.  (Hr'g Tr. Vol. I.)  Further, Entine testified that she discussed with several members of the Chi Omega executive board the possibility of serving as Vice President-elect and Vice-President without living in the sorority house, but that this would not be possible without rewriting the sorority's bylaws—an option that Chi Omega's President was unwilling to entertain.  (*See id.*)

As for Lissner's argument that he has no authority over the housing assignments in the Chi Omega sorority house, it is somewhat disingenuous.  While ZACO is an independent third-party lessor, the record reflects that ZACO and Chi Omega both reached out to Lissner for assistance to resolve the impasse between Entine and Goldman.  (*See* Hr'g Tr. Vol. I–II.)  This makes sense, given that Lissner is the University's ADA Coordinator, and ZACO is required to comply with the University's disability and discrimination policies in order to provide on-campus housing.  And Lissner himself acknowledges that he is the University employee with the authority to resolve disability-related conflicts and that he is the one who ultimately made the decision to revoke Entine's service animal accommodation.  (*See* Hr'g Tr. Vol. I.)

In light of the fact that Entine has shown that she will suffer irreparable harm in the absence of an injunction—without being legally required doing so—this factor weighs heavily in favor of granting a preliminary injunction.

### D.  The Balance of Harm and the Public Interest Weighs in Favor of Granting an Injunction.

The final two factors, the balance of harm and the public interest, likewise favor Entine. First and foremost, the existence of statutes such as the ADA, Fair Housing Act, and Rehabilitation Act "reflects the fact that there is significant public interest in eliminating discrimination against individuals with disabilities and that this interest is furthered by appropriate injunctive relief."  *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 688 (S.D. Ohio 2012) (internal quotation marks and citation omitted).  And Entine correctly points out that agency regulations that "explicitly require public entities to modify policies to permit service animals with only narrow exceptions reiterates that requiring entities to allow service animals serves the clear public interest."  (ECF No. 10 at 10.)  Put another way, Congress has spoken through the enactment of the ADA and its regulations that there is a clear public interest in allowing access to service animals.

Second, while the Court does not intend to minimize the difficulty Goldman faces by living with Crohn's disease, allergies, and asthma, she has simply not established that it is Cory's presence that causes her harm.  In fact, Goldman's coexistence with Cory in the Chi Omega house since August—in addition to her apparent lack of allergic reaction to Cory during her testimony at the Preliminary Injunction hearing—suggests that Goldman's allergies are not so severe as to outweigh the presumption favoring the use of service animals under the ADA.

The University's "vested interest in applying their policies equally and fairly, particularly those policies that affect students with disabilities," is an important one.  (ECF No. 14 at 14.) But this puts the cart before the horse.  Before the University can apply its policies equally to two students with disabilities who have requested irreconcilable accommodations, the University must be certain that: (1) the student has properly requested an accommodation; and (2) that accommodations are indeed irreconcilable.  Part and parcel of the second task is properly performing the direct threat analysis and establishing that one student's accommodation is indeed the cause of the aggravation of the other student's disability.

Accordingly, the third and fourth factors weigh in favor of granting a preliminary injunction.

### III.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** Entine's Motion for Preliminary Injunction.  Lissner and all those acting in concert with him, including the University, are hereby enjoined and restrained from removing Entine or Cory from the Chi Omega sorority house or taking any adverse action against her if she remains in the house with Cory.  The injunction will remain in effect through the Court's final decision on the merits of the case.

**IT IS SO ORDERED**.


         **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**Dated: November 17, 2017**

21